# IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE

In re

Case No.  12-33942

GERALD LOYD MILLER

Debtor

## MEMORANDUM ON DEBTOR'S
## MOTION TO CONVERT TO CHAPTER 11

**APPEARANCES:**    GRIBBLE, CARPENTER & ASSOCIATES
Keith L. Edmiston, Esq.
118 Parliament Drive
Maryville, Tennessee  37804
Attorneys for Debtor

GENTRY, TIPTON & MCLEMORE, P.C.
Maurice K. Guinn, Esq.
Post Office Box 1990
Knoxville, Tennessee  37901

Tyler C. Huskey, Esq.
2430 Teaster Lane
Suite 210
Pigeon Forge, Tennessee  37863
Attorneys for Tennessee State Bank

SAMUEL K. CROCKER, ESQ.
UNITED STATES TRUSTEE
Patricia C. Foster, Esq.
Howard H. Baker, Jr. United States Courthouse
800 Market Street
Suite 114
Knoxville, Tennessee  37902
Attorneys for United States Trustee

**RICHARD STAIR, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

This contested matter is before the court on the Motion to Convert Case From a Case Under Chapter 7 to a Case Under Chapter 11 (Motion to Convert) filed by the Debtor on April 5, 2013. On April 10, 2013, Tennessee State Bank filed the Objection by Tennessee State Bank to Motion to Convert Case From a Case Under Chapter 7 to a Case Under Chapter 11 (Objection), arguing that the Debtor did not file the Motion to Convert in good faith, that he has failed to turnover records to the United States Trustee, and that any plan of reorganization will be a liquidation of assets, which is more properly achieved in a Chapter 7 case. The issue to be resolved, as stated in the April 12, 2013 scheduling Order, is whether the Debtor is eligible to be a debtor under Chapter 11 as required by 11 U.S.C. § 706(d) (2006). Pursuant to the court's April 12, 2013 Order, Tennessee State Bank filed, on May 17, 2013, a Statement by Tennessee State Bank of Cause Factors and Bad Faith Acts, identifying the "cause" factors expressly identified in 11 U.S.C. § 1112(b)(4) (2006) that it argues are present in this case and/or reflecting the Debtor has engaged in "bad faith" which it supplemented on June 24, 2013, with the Supplement to Statement by Tennessee State Bank of Cause Factors and Bad Faith Acts (collectively, Statement of Cause Factors and Bad Faith Acts).

The trial on the Motion to Convert was held on July 1, 2013. The record before the court consists of the Stipulations filed by the parties on June 25, 2013, forty-nine exhibits introduced into evidence, and the testimony of four witnesses, Ann Mostoller, Chapter 7 Trustee, Shelly Spurgeon, Senior Vice President of Special Assets for Tennessee State Bank, Harold Ellison, and the Debtor.

# I

On September 28, 2012, Tennessee State Bank commenced this bankruptcy case against the Debtor through the filing of an Involuntary Petition under Chapter 7 of the Bankruptcy Code. On that same date, Tennessee State Bank also filed an Involuntary Petition commencing, under Chapter 7, Case No. 12-33943 against Karen L. Miller, the Debtor's wife. Both Involuntary Petitions were later joined by the Housholder Family Trust and Charles A. and Melanie McGinnis. Tennessee State Bank is a creditor of the Debtor by virtue of thirteen Notes from Gerald Miller secured by real property located in Sevier County, Tennessee, owned by the Debtor, individually, or jointly with his wife, Karen L. Miller (collectively, the Millers).[1] COLL. TRIAL EXS. 1– 13. As of the September 28, 2012 petition date, the aggregate outstanding balance on the thirteen Notes, inclusive of interest and late charges, was $7,369,348.53, and Tennessee State Bank has, as of June 17, 2013, incurred legal fees of $68,375.38 with respect to the Millers, with $2,575.00 of that amount attributable solely to the Debtor. TRIAL EX. 14; TRIAL EX. 23.

On October 5, 2012, the Debtor filed a Voluntary Petition under Chapter 11 in the Middle District of Florida commencing bankruptcy Case No. 12-06567-JAF. COLL. TRIAL EX. 32. Thereafter, on October 19, 2012, he filed an Answer to the Involuntary Petition which was amended on October 24, 2012, to include a List of Creditors reflecting seventeen creditors as well as an Amended Exhibit A to his Amended Answer adding Sevier County Bank and Tennessee State Bank as creditors. COLL. TRIAL EX. 29. Finally, on December 7, 2012, the Debtor filed an Amended List of Creditors reflecting twenty-five creditors. TRIAL EX. 31.

---

[1] Mrs. Miller is also a co-obligor on four of the Notes.

3

On November 9, 2012, the Debtor filed a Motion for Summary Judgment seeking a determination that Tennessee State Bank was not a qualified petitioning creditor to which Tennessee State Bank filed its Reply to the Motion for Summary Judgment on November 29, 2012. Following an Order entered on December 7, 2012, denying summary judgment with respect to the petitioning creditors' statuses as creditors and qualifications to be petitioning creditors, and a trial held on December 21, 2012,[2] an Order for Relief was entered against the Debtor on January 9, 2013.[3] Ann Mostoller was appointed Chapter 7 Trustee in the Debtor's Chapter 7 bankruptcy case and continues to serve in that capacity. The Debtor's initial meeting of creditors was scheduled for March 8, 2013, but has been adjourned on several occasions, presumably to allow time for the court to rule on the Motion to Convert. On April 25, 2013, the Chapter 7 Trustee filed a Motion for Turnover Order, asserting that the Debtor is the sole owner of several vehicles identified in the motion, to which the Debtor filed an Objection of Debtor in Opposition to Motion for Turnover Order. *See* TRIAL EXS. 42–43. Following a hearing on the Motion for Turnover Order, on June 10, 2013, the court entered the Order Resolving Motion of Trustee for Turnover, directing turnover of titles to vehicles and one-half of the proceeds in the Debtor's joint bank account, all of which have since been turned over to the Chapter 7 Trustee. *See* TRIAL EX. 44.

At the time the Involuntary Petitions were filed against them, the Debtor, who is a licensed real estate broker, and Karen L. Miller owned 100% of the stock in Cove Mountain Realty, Inc., an entity which lists real estate for sale, manages a cabin rental program, and operates a campground

---

[2] The parties' Stipulations erroneously state that the trial was conducted on December 22, 2012.

[3] This Order also granted the Motion of Tennessee State Bank to Determine Venue for the Administration of the Debtor's Estate and directed that the Debtor's bankruptcy case would proceed before this court rather than in the Middle District of Florida where the Debtor filed his Voluntary Petition under Chapter 11.

in Sevier County, Tennessee.  Pursuant to a Lease Agreement between the Millers and Katherine Housholder, Marceil H. Peery, and James A. Housholder that had been assigned to Tennessee State Bank for collateral purposes, counsel for Tennessee State Bank sent a letter to Cove Mountain Resorts on July 14, 2012, requesting that all future payments for rents from Cloud 9, a cabin property owned by the Millers, be made directly to Tennessee State Bank.  TRIAL EX. 21; TRIAL EX. 24.  In order to protect its collateral, Tennessee State Bank has made all lease payments under the Lease Agreement since the Millers stopped making payments in June 2011.  *See* TRIAL EX. 22. Additionally, the base property taxes owing to Sevier County, Tennessee, on the real properties securing Tennessee State Bank's Notes, not including interest or penalties, are $56,187.00.  *See* TRIAL EX. 37.

On February 19, 2013, the court held a trial on the Involuntary Petition filed against Karen L. Miller and, on March 14, 2013, entered an Order for Relief in Case No. 12-33943, which was subsequently converted to Chapter 11, without objection, on March 28, 2013.  The Debtor filed his Motion to Convert on April 5, 2013, and Tennessee State Bank filed its Objection to Motion to Convert on April 10, 2013.

## II

The Debtor seeks to convert his case to Chapter 11 under the authority of § 706, which allows a debtor to convert from Chapter 7 to another chapter if the case has not previously been converted and the debtor is eligible to be a debtor under the chapter to which it is to be converted.  *See* 11 U.S.C. § 706(a), (d) (2006).  The right to convert, however, is not absolute where cause may exist

5

to convert or dismiss under the chapter to which the debtor seeks conversion or when denial of a

conversion motion would serve to prevent "an abuse of process." *Marrama v. Citizens Bank of

Mass.*, 549 U.S. 365, 372-75, 127 S. Ct. 1105, 1110-12, 166 L.Ed.2d 956 (2007).  In finding bad

faith conduct by a debtor sufficient to deny conversion based on his ineligibility to qualify to be a

debtor under Chapter 13, the Supreme Court summarized the facts in *Marrama* as follows:

> Marrama misrepresented the value of his Maine property and that he had not
> transferred it during the preceding year.  Respondent DeGiacomo, the trustee of
> Marrama's estate, stated his intention to recover the Maine property as an estate
> asset.  Thereafter, Marrama sought to convert the proceeding to Chapter 13, but the
> trustee and respondent bank, Marrama's principal creditor, objected, contending that
> the request to convert was made in bad faith and would constitute an abuse of the
> bankruptcy process.

*Marrama*, 549 U.S. at 365, 127 S. Ct. at 1106; *see also In re Sammut*, 486 B.R. 404, 407 (Bankr.

E.D. Mich. 2012) (stating that "the Court held that the bankruptcy court can deny conversion if the

debtor has acted in bad faith before seeking to convert, either during the Chapter 7 case or before the

bankruptcy case."); *In re Lane*, 2011 WL 3205782, at *3, 2011 Bankr. LEXIS 2906, at *8 (Bankr.

D. Colo. July 26, 2011) (summarizing the facts as follows in finding that the debtors' conduct did

not "rise to the level of misconduct that took place in *Marrama* . . . [where] the debtor listed his

house as having a value of zero, while the house actually had substantial value[, and] the debtor in

*Marrama* transferred the house to a trust with the admitted intention of protecting his property from

creditors."); *In re Hua*, 411 B.R. 671, 672-73 (Bankr. S.D. Cal. 2009) ("*Marrama* has to be

understood in its factual context, which involved concealment of an asset in the pending Chapter 7

case.  When the trustee discovered and pursued the asset, the debtor sought to convert the case[.] So

while the debtor's bad faith conduct was committed prior to conversion, it was committed in

conjunction with the filing of his chapter 7 petition and thereafter."). Explaining its reasoning, the

Court further stated:

> Nothing in the text of . . . § 706 . . . (or the legislative history . . .) limits the authority
> of the court to take appropriate action in response to fraudulent conduct by the
> atypical litigant who has demonstrated that he is not entitled to the relief available to
> the typical debtor. On the contrary, the broad authority granted to bankruptcy judges
> to take any action that is necessary or appropriate "to prevent an abuse of process"
> described in § 105(a) of the Code, is surely adequate to authorize an immediate
> denial of a motion to convert filed under § 706 in lieu of a conversion order that
> merely postpones the allowance of equivalent relief and may provide a debtor with
> an opportunity to take action prejudicial to creditors.

*Marrama*, 549 U.S. at 374-75, 127 S. Ct. at 1111. Although *Marrama* addressed the issue in

connection with a conversion to Chapter 13, it applies equally to cases in which a debtor seeks to

convert from Chapter 7 to Chapter 11. *Levesque v. Shapiro (In re Levesque)*, 473 B.R. 331, 339

(B.A.P. 9th Cir. 2012).

The Debtor must meet the threshold requirements of § 706 that he has not previously

converted his case and is eligible to be a Chapter 11 debtor after which Tennessee State Bank, as the

objecting party, bears the burden of proving by a preponderance of the evidence why the Debtor

should not be permitted to convert under the heightened standard imposed by *Marrama*. *In re FMO*

*Assocs. II, LLC*, 402 B.R. 546, 551 (Bankr. E.D.N.Y. 2009).

> The burden of proof on the motion to convert is on the debtor. The debtor must first
> make a *prima facie* case for conversion (showing there has been no prior conversion
> in the case, that the debtor is eligible for relief under § 109, and that conversion is to
> achieve a purpose permitted under the proposed Chapter). The burden of coming
> forward with evidence then shifts to the objecting parties to show that the debtor is
> not eligible for relief under *Marrama*.

*In re Broad Creek Edgewater, LP*, 371 B.R. 752, 757 (Bankr. D.S.C. 2007); *see also In re George*

*Love Farming, LC*, 366 B.R. 170, 179 (Bankr. D. Utah 2007) ("[U]nder *Marrama*, a debtor seeking

to convert a case from chapter 7 has an initial burden to show that [he] has not previously converted . . ., and that [he] is otherwise eligible to be a debtor under the new chapter (in this case, chapter 11). Once the debtor establishes these requirements, the burden is placed on an objecting party to show that the debtor is attempting to convert the case in bad faith.").  Here, there is no dispute that the Debtor has not previously converted his case, which was commenced on September 28, 2012, by the filing of an Involuntary Petition, and that he is eligible pursuant to § 109(d), which allows "a person that may be a debtor under chapter 7 of this title[,]" to likewise be a Chapter 11 debtor.  11 U.S.C. § 109(d) (2006).

When making a determination with respect to conversion from Chapter 7 to Chapter 11, courts generally consider the "for cause" factors set forth in 11 U.S.C. § 1112(b) (2006) "or if the debtor has engaged in 'bad faith' conduct," *In re Basil St. Partners, LLC*, 477 B.R. 856, 862 (Bankr. M.D. Fla. 2012), in addition to analyzing "whether the debtor has a business to reorganize as well as the debtor's assets, business operations, and whether a separate business infrastructure exists." *In re Home Network Builders, Inc*., 2006 WL 3419791, at *3, 2006 U.S. Dist. LEXIS 89541, at *10-11 (D.N.J. Nov. 22, 2006).  "Other courts consider the purpose of a conversion and if the purpose is only to liquidate, which is more compatible with a Chapter 7 than a Chapter 11 case, conversion may not be appropriate.  In each instance, though, the goal is to determine the benefits to all the parties." *Proudfoot Consulting Co. v. Gordon (In re Gordon)*, 465 B.R. 683, 692 (Bankr. N.D. Ga. 2012) (citation omitted).  Additionally, the following relevant factors for evaluating a motion to convert from Chapter 7 to Chapter 13 under § 706(a) may likewise be applied in the analysis for conversion from Chapter 7 to Chapter 11:

8

(i) whether the debtor is seeking to convert to chapter [11] in good faith (including a review of facts such as the timing of the motion to convert; the debtor's motive in filing the motion; and whether the debtor has been forthcoming with the bankruptcy court and creditors);

(ii) whether the debtor can propose a confirmable . . . plan;

(iii) the impact on the debtor of denying conversion weighed against the prejudice to creditors caused by allowing conversion;

(iv) the effect of conversion on the efficient administration of the bankruptcy estate; and

(v) whether conversion would further an abuse of the bankruptcy process.

*In re Yarborough*, 2012 WL 4434053, at *2, 2012 Bankr. LEXIS 4403, at *6 (Bankr. E.D. Tenn. Sept. 24, 2012) (quoting *In re Tufano*, 2011 WL 1473384, at *4, 2011 Bankr. LEXIS 1399, at *9-10 (Bankr. M.D. Pa. Apr. 19, 2011)).

In support of his Motion to Convert, the Debtor argues that he did not choose to be in a Chapter 7 case; instead, that he had intended to file – and actually did file in Florida – a Chapter 11 bankruptcy case. He contends that the best interests of the estate will be served by conversion, even if the plan he proposes is a liquidating plan. Because he is a licensed real estate broker, the Debtor argues that he can market and sell the estate's property quickly, efficiently, and at a lower cost to the Chapter 11 estate because the estate would not incur real estate commissions or trustee's fees. On the other side, Tennessee State Bank argues that the Debtor should not be allowed to convert based upon a number of factors concerning his pre- and post-petition conduct. The § 1112(b) "causal" factors raised by Tennessee State Bank are "(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; [and] . . . (I) failure . . . to file tax returns due after the date of the order for relief[.]" 11 U.S.C. § 1112(b)(4). Additionally, in the

9

Statement of Cause Factors and Bad Faith Acts, Tennessee State Bank raises the following acts which it claims evidence bad faith to constitute "cause" under § 1112(b): (1) the failure to file a motion to convert for nearly three months after entry of the Order for Relief; (2) the failure to identify creditors in connection with the Involuntary Petition; (3) the failure to turnover property of the estate despite a demand from the Chapter 7 Trustee; (4) the failure to timely turnover all records requested by the Chapter 7 Trustee; (5) entering into a Sale Agreement for the Valley Mart Exxon without the approval of the Chapter 7 Trustee; (6) the failure to disclose all assets; (7) the failure to disclose all sources of income and income in the Statement of Financial Affairs; (8) the unauthorized payment of approximately $8,000.00 in Illinois property taxes from funds in which the estate had a joint interest; (9) the Debtor is not realizing any value for an Illinois property occupied by his daughter, his grandson, and former wife who are not paying any consideration; (10) the Debtor is not realizing any value from Cove Mountain Realty, Inc. for use of two separate properties located in Pigeon Forge in which the Millers jointly hold interests; (11) the Debtor is not receiving any rental income from Movieland Games which occupies a unit in a shopping center owned jointly by the Millers; and (12) the Debtor is unfamiliar with his personal financial affairs as well as those of Cove Mountain Realty, Inc., in which he owns 50% interest.

## A

The initial burden of proof under § 1112(b) lies with the moving party to establish "cause" by a preponderance of the evidence, after which the burden shifts to the debtor to prove either the existence of "unusual circumstances" or that there is a reasonable likelihood a plan will be confirmed and that any deficiencies in the case are reasonably justified and will be cured within a reasonable

period of time.  *In re Mell*, 419 B.R. 357, 366-67 (Bankr. N.D. Iowa 2009).  The bankruptcy court

has a great deal of discretion in determining whether one of the exceptions exists.  *In re Prods. Int'l

Co.*, 395 B.R. 101, 109 (Bankr. D. Az. 2008).  "Bankruptcy courts should proceed in a deliberate

manner when confronted with . . . [§] 1112(b) . . . [however,] if the Chapter 11 case cannot achieve

a reorganization within the statutory requirements of the Code, then there is no point in expending

estate assets on administrative expenses, or delaying creditors in the exercise of their non-bankruptcy

law rights."  *DCNC N. Carolina I, LLC v. Wachovia Bank, N.A.*, 2009 WL 3209728, at *3, 2009

U.S. Dist. LEXIS 93046, at *10 (E.D. Pa. Oct. 5, 2009) (citations omitted).

Tennessee State Bank first argues that cause exists to deny conversion under § 1112(b) for

"substantial or continuing loss to or diminution of the estate and the absence of a reasonable

likelihood of rehabilitation."  11 U.S.C. § 1112(b)(4)(A).  In support, Tennessee State Bank argues

that the Debtor has not made any payments on the thirteen Notes, which continue to accrue interest

and the collateral continues to incur taxes, since August 2011.  Additionally, Tennessee State Bank

questions why rents and income from camper storage and cabin rentals are being retained by Cove

Mountain rather than being paid into the Millers' respective bankruptcy estates and why the Debtor's

estate is not receiving any payments from Movieland Games, which is also operated by the Millers.

It also questions why the Debtor allows residential real property located in Edwardsville, Illinois

(Illinois Residence), for which the Millers recently paid property taxes of approximately $8,000.00

to avoid a tax sale, to be occupied by his former wife, his daughter, and his grandson without any

payments or consideration back to the Millers.  Finally, with respect to the rehabilitation prong,

Tennessee State Bank argues that the Debtor plans to liquidate, which would be better served in

11

Chapter 7 and that the Debtor's income since 2010 has, reportedly, been $10,500.00 from employment and $20,000.00 from Social Security, so he cannot fund a plan of reorganization.

The § 1112(b)(4)(A) analysis contemplates a "two-fold" inquiry into whether the estate has decreased in value and if there is a reasonably likelihood of rehabilitation[,] *In re V Cos.*, 274 B.R. 721, 725-26 (Bankr. N.D. Ohio 2002), and because the statute is written in the conjunctive, both requirements must be satisfied. *In re BH S&B Holdings, LLC*, 439 B.R. 342, 347 (Bankr. S.D.N.Y. 2010). With respect to the first prong, the focus is on "whether post-petition, the debtor has suffered or continued to experience a negative cash flow, or, alternatively, declining asset values[,]" *In re Landmark Atl. Hess Farm, LLC*, 448 B.R. 707, 713-14 (Bankr. D. Md. 2011); *see also In re Westgate Props., Ltd.*, 432 B.R. 720, 723 (Bankr. N.D. Ohio 2010) (requiring proof that the debtor "continues to incur losses or maintains a negative cash-flow position after the entry of the order for relief."); *Nester v. Gateway Access Solutions, Inc. (In re Gateway Access Solutions, Inc.)*, 374 B.R. 556, 564 (Bankr. M.D. Pa. 2007) ("Negative cash flow and an inability to pay current expenses as they come due can satisfy the continuing loss or diminution of the estate standard for the purposes of § 1112(b)."). Nevertheless, "the accrual of liabilities [such as professional fees and/or taxes] are not the same as the incurring of actual out-of-pocket losses, such as the dissipation of assets that diminishes the estate." *In re Gabriel Techs. Corp.*, 2013 WL 2318581, at *3, 2013 Bankr. LEXIS 2162, at *7-8 (Bankr. N.D. Cal. May 28, 2013). As to the second prong, "[t]he issue of rehabilitation for purposes of § 1112(b)(4)(A) 'is not the technical one of whether the debtor can confirm a plan, but, rather, whether the debtor's business prospects justify continuance of the reorganization effort.'" *In re LG Motors, Inc.*, 422 B.R. 110, 116 (Bankr. N.D. Ill. 2009) (citations omitted); *see also Basil*

*St. Partners, LLC*, 477 B.R. at 862 (same).    "[R]ehabilitation does not necessarily denote reorganization, which could involve liquidation.    Instead, rehabilitation signifies something more, with it being described as 'to put back in good condition; re-establish on a firm, sound basis.'" *Westgate Props., Ltd.*, 432 B.R. at 723 (quoting *V Cos.*, 274 B.R. at 725); *see also Landmark Atl. Hess Farm, LLC*, 448 B.R. at 714-15 ("[R]ehabilitation is not synonymous with reorganization and the determination is not whether a debtor can confirm a plan, but whether the debtor has sufficient business prospects."); *BH S&B Holdings, LLC*, 439 B.R. at 347 (citation omitted) ("In this context, rehabilitation means to put back in good condition and reestablish on a sound basis.").

Tennessee State Bank first argues that there is a continuing loss based upon the rising expenses and costs associated with the Notes, and in response, the Debtor argues that loss of assets or value to the estate was not documented or proved by Tennessee State Bank and that the estate is not any less valuable than it was when the Order for Relief was entered.    As of September 28, 2012, the aggregate balance owed Tennessee State Bank on the thirteen Notes was $7,389,348.53, of which $5,614,315.04 is principal.    TRIAL EX. 14.    The Debtor has not made payments on any of the Notes since August 2011, and interest continues to accrue at $3,691.61 per diem, which translates to approximately $110,748.30 monthly.    TRIAL EX. 15.    Additionally, taxes owed to Sevier County on Tennessee State Bank's collateral, dating back to 2009, continue to accrue and are currently $56,187.00,[4] and Tennessee State Bank continues to incur attorneys' fees, which were $68,375.38 as of June 17, 2013, in association with the Debtor and his obligations under the Notes.    TRIAL EX. 37; TRIAL EX. 23.    Finally, Tennessee State Bank has paid $65,457.35 under the Housholder

---

[4] The taxes owed to Sevier County are $56,187.00 after the Millers' unauthorized post-petition payments of $15,167.12.    *See* Section III.C., *infra*.

Lease Agreement.  TRIAL EX. 22.  Unquestionably, the debt owed to Tennessee State Bank has

continued to increase which would, logically, serve to decrease any equity in the collateral securing

the Notes.  Nevertheless, all property requested by the Chapter 7 Trustee for turnover, including

approximately $51,000.00 cash, has, in fact, been turned over to her, and she is in control of the

Debtor's estate and all assets contained therein.  Accordingly, it is the Chapter 7 Trustee, and not the

Debtor, who controls what monies are being paid into and out of the Debtor's bankruptcy estate, and

if there is an issue concerning funds being retained by Cove Mountain Realty and/or used by

Mrs. Miller's bankruptcy estate, the Chapter 7 Trustee is the only person with the authority to do

anything.[5]  Additionally, nothing in the record supports Tennessee State Bank's contention that the

Debtor allowing his family to reside in the Illinois Residence causes any sort of loss or diminution

of his bankruptcy estate.  Although Tennessee State Bank may have shown that there is a decline in

the equity of its collateral, it has not sufficiently shown that the Debtor's assets are declining in value

outside the accrual of interest and attorneys' fees pursuant to the Notes, which does not, as

previously stated, rise to the level of continuing loss or diminution of the estate required to satisfy

the first § 1112(b)(4)(A) prong.

Furthermore, Tennessee State Bank has not satisfied the second prong of the analysis and

proved that the Debtor cannot effectuate a successful reorganization.  At trial, the Debtor testified

that if the case is converted to Chapter 11, he intends to propose a plan that incorporates both

liquidation of property and the continuation of his businesses to pay his debts.  At trial, the Debtor

testified that he hopes to keep the following properties listed in his Schedule A: (1) 159 Alden Lane,

---

[5] At trial, the Debtor testified that his wife, Karen Miller, controls the money and was told in January and February 2013, to put all income received from Cove Mountain Realty into her debtor-in-possession account.

Edwardsville, Illinois, which is occupied by his daughter, grandson, and former wife; (2) 3958 Wears Valley Road, Sevierville, Tennessee, housing the campground office and campers; (3) 3141 Happy Hollow Road, Sevierville, Tennessee, consisting of nine campsites; (4) 3202 Wears Valley Road, Sevierville, Tennessee, consisting of the rental and real estate office of Cove Mountain Realty; and (5) 335 Wears Valley Road, Sevierville, Tennessee, consisting of a shopping center currently occupied by Tobacco King, Altell Wireless, and Subway.  The Debtor also testified that he intends to use his real estate license and expertise to market and sell the remaining properties: (1) 2203 Highway 58, Hephzabah, Georgia; (2) 19430 Streeb Lane, Staunton, Illinois; (3) 3174 Wears Valley Road, Sevierville, Tennessee; (4) Laurelwood Avenue, Sevierville, Tennessee; (5) 2496 Black Bear Ridge Way, Sevierville, Tennessee; (6) approximately 130 acres Little Cove Road, Sevierville, Tennessee; (7) tracts 3 and 4 Margaret Hollow Way and property 12308313000 Blue Springs Way, Sevierville, Tennessee; (8) 7929 East Lamar Alexander Place, Townsend, Tennessee; (9) lots 1 and 4 Little Cove Church Road, Sevierville, Tennessee; (10) lots 11 and 12 Little Cove Road, Sevierville, Tennessee; (11) 1441 Little Cove Road, Sevierville, Tennessee; (12) 16 acres Hickory Hollow Way, Sevierville, Tennessee; (13) Possum Ridge Way, Sevier County, Tennessee; (14) 4.45 acres Hickory Hollow Way, Sevierville, Tennessee; (15) Millers Ridge Way, Sevierville, Tennessee; and (16) 5 acres Wears Valley Road, Townsend, Tennessee. COLL. TRIAL EX. 16.[6]  With respect to funding a plan and servicing debt, the Debtor stated that the shopping center earned approximately $4,500.00 per month, that per Mrs. Miller's estimates, the

---

[6] The Debtor's intention with respect to these properties is also reflected in his Chapter 7 Individual Debtor's Statement of Intention, although in that document, he also states an intent to surrender 3202 Wears Valley Road, Sevierville, Tennessee, 3958 Wears Valley Road, Sevierville, Tennessee, and 3141 Happy Hollow Road, Sevierville, Tennessee, which he specifically identified through his trial testimony as properties he hoped to retain.  TRIAL EX. 52.

15

campground earns approximately $100,000.00 annually, and that he can contribute funds from Cove Mountain Realty, Inc., although he could not provide a specific dollar amount that would be available.

In order to support its contention that the Debtor cannot successfully reorganize, Tennessee State Bank showed, through his testimony, that the Debtor has allowed Mrs. Miller to be fully responsible for all accounting and monetary aspects of his personal and business finances.  As established at trial, the Debtor unquestionably relies on his wife to maintain the Millers' personal and business finances.  He testified that he has been married to Mrs. Miller for many years and has relied on her to maintain their finances the entire time.  Throughout his testimony, any time he was asked financially related questions, the Debtor stated that he relied on Mrs. Miller, that she had told him how much money each business made or was expected to bring in, or that he was unsure about an answer because his wife did all the bookkeeping and he did not personally know.  Additionally, when questioned about the income derived from the shopping center, the campground lots, and cabin, the Debtor testified that he understood that all of that income was going into Mrs. Miller's debtor-in-possession account but that he had never questioned why.  In essence, the Debtor testified that he does not perform any of the bookkeeping or reporting activities personally or in his businesses, nor does he keep track of the bank accounts or question what happens to the funds within, that he has always left those duties to Karen Miller, leaving him responsible for the day-to-day operations.  He also testified that, in the event his case was converted, he expected to work with her to sell the jointly owned properties and that she would assist him in his Chapter 11 case.  The Debtor's reliance was further evidenced by the testimony of Ms. Mostoller, the Chapter 7 Trustee

16

in his case, who testified that the Debtor provided her with information about his business interests, that he knows what real properties are owned and how the businesses generally work but that he was not able to provide financial information because he relies on Mrs. Miller for that aspect of their personal and business lives.  Ms. Mostoller also testified that she has met with Mrs. Miller several times and that, upon Ms. Mostoller's requests, it was Mrs. Miller who has provided her with the Debtor's records, and that she, Ms. Mostoller, did not have any complaints about her dealings with Mrs. Miller, who had provided her with all requested information in a fairly quick manner.

While the court agrees that perhaps the Debtor should monitor his finances more closely and rely less on Mrs. Miller to the extent that he was unable to answer several questions at trial concerning his basic financial information, the fact that the Debtor allows his wife to manage all financial aspects of their closely-held businesses while he attends to the daily operations does not constitute mismanagement or bad faith and does not weigh against his ability to successfully reorganize.  In fact, because Karen Miller is likewise in a Chapter 11 case and their properties and estates are so closely related and intertwined, the Debtor's contention that the Millers' joint creditors would be better served if both were in Chapter 11 reorganization cases wherein their joint interests could be serviced without the intervention of a Chapter 7 trustee carries merit.

For the foregoing reasons, the court finds that neither prong of § 1112(b)(4)(A) has been satisfied, and cause does not exist under that subsection to deny the Debtor's Motion to Convert.

17

**B**

Tennessee State Bank also argues that the Motion to Convert should be denied because the Debtor has not filed his tax returns, which is denoted as "cause" for failing "timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief[,]" 11 U.S.C. § 1112(b)(4)(I), because "[t]he timely payment of post-petition taxes is crucial[.]"  *In re Tri-Chek Seeds, Inc.*, 2013 WL 636031, at *4, 2013 Bankr. LEXIS 500, at *12 (Bankr. S.D. Ga. Feb. 7, 2013).  Additionally, although the statute expressly states that it is the failure to pay taxes and/or file returns after the date that the Order for Relief was entered, "[p]re-petition tax-filing conduct [is] not irrelevant to the Court's inquiry."  *In re Dr. R.C. Samanta Roy Inst. of Sci. Tech., Inc.*, 465 Fed. Appx. 93, 98 (3d Cir. June 15, 2011).  In support of this subsection, Tennessee State Bank states that the Debtor has not filed either his 2011 or 2012 tax returns.  In response, the Debtor acknowledged at trial that he had not filed his returns but testified that he had provided their CPA with their tax information months ago but that through a telephone call from his attorney, the Debtor had learned that the Millers' joint 2011 return was finished, that his accountant had advised him that they were entitled to a refund, and he was picking it up from his accountant the afternoon following the trial.  As for the 2012 return, the Debtor testified that they had obtained an extension but that the return was being prepared by his accountant and would be filed as soon as it was completed.

The language of the statute expressly addresses payment of taxes and the filing of returns after entry of an order for relief.  In this case, the Order for Relief was entered on January 9, 2013.  Accordingly, cause under § 1112(b)(4)(I) would exist with respect to any post-petition taxes and/or returns due after that date.  Because his 2011 and 2012 tax returns reflect tax liabilities incurred prior

18

to January 9, 2013, his failure to have timely filed those returns – while relevant – is not determinative.[7] The court is satisfied with the Debtor's explanation that his 2011 tax return was in the process of being filed at or near the time of trial and that his 2012 return, for which he had obtained an extension, was being prepared and would be filed thereafter. The failure to file his 2011 and 2012 tax returns does not, therefore, constitute cause under § 1112(b)(4)(I) to deny the Debtor's Motion to Convert.

## C

Finally, Tennessee State Bank argues that the Debtor's conduct evidences bad faith, thus also justifying denial of his Motion to Convert. Stating that "[t]he principal purpose of the Bankruptcy Code is to grant a fresh start to the honest but unfortunate debtor[,]" the Supreme Court held that bad faith may be cause to deny conversion. *Marrama*, 549 U.S. at 367, 127 S. Ct. at 1107. Additionally, the Sixth Circuit has consistently held that "cause" includes bad faith, *Trident Assocs. Ltd. P'ship v. Metro. Life Ins. Co. (In re Trident Assocs. Ltd. P'ship)*, 52 F.3d 127, 130 (6th Cir. 1995), with the party "challenging a debtor's good faith bear[ing] the burden of proof with any ambiguities resolved in favor of the debtor." *Yarborough*, 2012 WL 4434053, at *2, 2012 Bankr. LEXIS 4403, at *8. In making a good faith determination, courts consider a "totality of the circumstances[,]" *Laguna Assocs. Ltd. P'ship v. Aetna Cas. & Sur. Co. (In re Laguna Assocs. Ltd. P'ship)*, 30 F.3d 734, 738 (6th Cir. 1994), as "[g]ood faith is an amorphous notion, largely defined by factual inquiry[,]" *Metro. Emp. Credit Union v. Okoreeh-Baah (In re Okoreeh-Baah)*, 836 F.2d 1030, 1033 (6th Cir. 1988).

---

[7] The Debtor also acknowledged that the Internal Revenue Service had filed a tax lien against the Millers which they had satisfied prior to the commencement of the Involuntary Petition against him.

"Both the fairness of the result to the creditor and the bona fides of the debtor's purpose in filing the petition are relevant to the bad faith inquiry." *Finizie v. City of Bridgeport (In re Finizie)*, 184 B.R. 415, 419 (Bankr. D. Conn. 1995). Furthermore, to qualify "as 'bad faith' sufficient to permit a bankruptcy judge to . . . deny conversion from Chapter 7[, i]t suffices to emphasize that the debtor's conduct must, in fact, be atypical." *Marrama*, 549 U.S. at 375 n.11, 127 S. Ct. at 1111 n.11.

"Bad faith is a term of art. Its inquiry can be objective rather than subjective. Thus, a court may find that a debtor is attempting to convert a case in bad faith based on the totality of circumstances without specifically finding that the debtor's motivation is evil." *George Love Farming, LC*, 366 B.R. at 179 (footnote omitted). The Supreme Court did not, in *Marrama*, "articulate with precision what conduct qualifies as 'bad faith' sufficient to permit a bankruptcy judge to . . . deny conversion from Chapter 7." *Marrama*, 549 U.S. at 375 n.11, 127 S. Ct. at 1111 n.11. In the Sixth Circuit, courts consistently consider "[w]hether the debtor has been forthcoming with the bankruptcy court and the creditors[,]" finding bad faith "when the debtor is seeking to abuse the bankruptcy process." *Alt v. United States (In re Alt)*, 305 F.3d 413, 419, 421 (6th Cir. 2002). The determination whether a debtor has acted in good faith requires a focus on, as defined by the Sixth Circuit, the following non-exhaustive factors:

(1) the debtor has one asset;

(2) the pre-petition conduct of the debtor has been improper;

(3) there are only a few unsecured creditors;

(4) the debtor's property has been posted for foreclosure, and the debtor has been unsuccessful in defending against the foreclosure in state court;

20

(5) the debtor and one creditor have proceeded to a standstill in state court litigation,

and the debtor has lost or has been required to post a bond which it cannot afford;

(6) the filing of the petition effectively allows the debtor to evade court orders;

(7) the debtor has no ongoing business or employees; and

(8) the lack of possibility of reorganization.

*Trident Assocs. Ltd. P'ship*, 52 F.3d at 131 (quoting *Laguna Assocs. Ltd. P'ship*, 30 F.3d at 738).

Courts likewise look to factors such as "the timing of the petition; how the debt arose; the debtor's

motive in filing the petition; how the debtor's actions affected creditors; the debtor's treatment of

creditors both before and after the petition was filed; and whether the debtor has been forthcoming

with the bankruptcy court and the creditors." *Alt*, 305 F.3d at 419 (quoting *In re Love*, 957 F.2d

1350, 1357 (7th Cir. 1992)).   Also relevant in this case are the following factors:  (1) the Debtor's

income and living expenses; (2) the Debtor's potential for future earnings; (3) the likelihood of

confirmation of a plan; (4) any special circumstances the Debtor may be subject to; (5) the frequency

with which the Debtor has sought relief before in bankruptcy; (6) the circumstances under which the

Debtor's debts were incurred; (7) the burden which administration would place on the trustee; and

(8) the statutorily-mandated policy that bankruptcy provisions be construed liberally in favor of the

Debtor.  *See Soc'y Nat'l Bank v. Barrett (In re Barrett)*, 964 F.2d 588, 592 (6th Cir. 1992).

Tennessee State Bank has raised a number of actions and specific conduct by the Debtor it

contends evidences the Debtor's bad faith.  First, the Bank argues that the Debtor waited for nearly

three months after the Order for Relief was entered to file his Motion to Convert, that he was not

forthcoming in identifying creditors in his involuntary case, amending his list of creditors three times

21

prior to the December 21, 2012 trial, and that the Debtor did not disclose a number of things in his

statements and schedules including uncashed checks from cabin rentals and the Valley Mart Exxon

rental, a transfer of real property for $50,000.00 in January 2012, the correct amount of his income,

all accounts closed during the year preceding his bankruptcy, payments to Michael D. Tranum, and

payments to the IRS in the two years before his bankruptcy that were, presumably, outside the

ordinary course of business.  Tennessee State Bank also argues that the Debtor did not turnover

property to the Chapter 7 Trustee when she requested, necessitating the filing of a motion for

turnover of assets, that the Debtor signed off on a Commercial Purchase and Sale Agreement for

Valley Mart Exxon without the authority to do so, that the Debtor has listed 3174 Wears Valley

Road, Sevierville, Tennessee (3174 Wears Valley Road Property) for sale during the course of the

Chapter 7 case, and that the Debtor made unauthorized post-petition payments for property in Sevier

County and for the Illinois Residence occupied by his daughter, grandson, and ex-wife.  Finally,

Tennessee State Bank argues that the Debtor is unaware of his personal financial affairs and instead,

relies on Karen Miller.  Based upon the record before it, the court does not agree that the Debtor's

actions and conduct constitute bad faith to support denial of the Motion to Convert.

As previously discussed, the fact that the Debtor has relied in the past – and testified that he

will continue to rely in the future – on his wife, Karen Miller, to handle all aspects of their individual

finances as well as the finances for their joint businesses is not unusual and does not give rise to any

bad faith conduct by the Debtor, even though his reliance to that great of an extent may be ill-advised

and has hindered the Debtor's knowledge of his own personal financial affairs.  Nevertheless, it is

not evidence of bad faith and does not support Tennessee State Bank's objection to the Debtor's

Motion to Convert. The court likewise does not agree with Tennessee State Bank's argument that the Motion to Convert should be denied because the Debtor did not file it for nearly three months following entry of the Order for Relief, finding that the Debtor has sufficiently explained his delay in filing the Motion to Convert. At trial, the Debtor testified that he had intended to file a Chapter 11 case, which he subsequently did in the Middle District of Florida, but that Tennessee State Bank commenced the involuntary Chapter 7 case against him before he could get his Chapter 11 case filed.[8] He also testified that upon entry of the Order for Relief against him in January 2013, he repeatedly directed his former attorney to move for conversion to Chapter 11 but was told that he had plenty of time to convert. Thereafter, the Debtor retained his present counsel and filed the Motion to Convert the following day. The Debtor's explanation and timing of these events sufficiently cures any issue of delay concerning the filing of the Motion to Convert.

The court also finds that the Debtor's actions and explanations with respect to the turnover of property and information to the Chapter 7 Trustee as well as the execution of a post-petition contract for the sale of the Valley Mart Exxon and the post-petition listing of the 3174 Wears Valley Road Property cure any potential bad faith issues. The Order for Relief was entered on January 9, 2013, following a trial held on December 21, 2012, and Ms. Mostoller was appointed Chapter 7 Trustee. She testified that upon her designation as Trustee, she sent an email to Thomas Ray, the Debtor's former counsel, to reschedule the creditors meeting and requested that all funds being held by the Debtor's former attorney in Florida remain intact. Ms. Mostoller also testified that she had discussions with Mr. Ray prior to the meeting of creditors, that they agreed to have a meeting with

---

[8] In support of this contention, the Debtor also testified that, prior to the filing of the Involuntary Petition, he had taken his consumer credit counseling briefing as required for individual debtors. *See* 11 U.S.C. § 109(h)(1) (2006).

23

the Debtor prior to the meeting of creditors, and at that time, Ms. Mostoller requested a limited number of records from the Debtor concerning his business entities, primarily, the Valley Mart Exxon and the shopping center, and she received the requested information about the Exxon station. Thereafter, at the initial meeting of creditors on March 8, 2013, Ms. Mostoller requested additional documents from the Debtor including one year of bank records for himself and his companies as well as personal and business tax returns for two years.   Thereafter, Ms. Mostoller prepared a list reflecting the information and bank statements that were provided to her by the Debtor through Mrs. Miller, who brought the documents to her fairly quickly.  TRIAL EX. 41.  Ms. Mostoller's subsequent request for follow-up information was then provided to her in June via an email from Mrs. Miller.

Ms. Mostoller testified that she filed the Motion for Turnover Order on April 25, 2013, because, based on the statements and schedules and the questioning at the meeting of creditors, it was apparent that the Debtor had a substantial amount of cash in a joint account with Mrs. Miller. *See* TRIAL EX. 42.  Ms. Mostoller testified that once it was determined that Mrs. Miller was properly a Chapter 11 debtor, Ms. Mostoller asked Mr. Ray to turnover one-half of the funds to her but she did not receive them.  Additionally, Ms. Mostoller had not received the titles to the Debtor's vehicles listed in his statements and schedules, so she filed the motion for turnover in order to protect and receive possession of those assets.  Two days later, the Debtor filed an objection to the turnover motion, but an Order Resolving Motion of Trustee for Turnover was entered on June 10, 2013, in which Ms. Mostoller agreed to withdraw the turnover motion and the Debtor agreed to turnover the

24

titles to the requested vehicles to the Trustee and one-half of the cash in the Debtor and Mrs. Miller's joint bank account to be held in his current counsel's trust account.  TRIAL EX. 43; TRIAL EX. 44.

With respect to the Valley Mart Exxon, a motion was filed in Karen Miller's bankruptcy Case No. 12-33943 on April 26, 2013, and amended May 1, 2013, seeking approval of a Commercial Purchase and Sale Agreement (Sale Agreement) between the Millers and James, Gail, Brandon, and Amanda Headrick for the purchase of the Valley Mart Exxon for $465,000.00.[9]  TRIAL EX. 45.  The signature lines for the Sale Agreement, which was executed by the Millers on April 15, 2013, reflect underneath the Debtor's name, in typewritten form, "Trustee Ann Mostoller;" however, Ms. Mostoller testified that she first learned of the Sale Agreement on April 18, 2013, when she received it via email from Mrs. Miller's attorney but that she did not execute the Sale Agreement, nor did she give her authorization for it to be entered into by either of the Millers.  She also testified that the Sale Agreement expressly states that it is contingent on third party approval and approval by the bankruptcy court and that she never knew for sure when her name was typed into the Sale Agreement.  When questioned at trial about his execution of the Sale Agreement, the Debtor testified that he did sign it; however, he was not asked to provide any specifics.  Instead, Mr. Ellison, who is a realtor and managing broker with Cove Mountain Realty, testified that he prepared and executed the Sale Agreement, that he had the Debtor sign the Sale Agreement, and that he personally typed in Ms. Mostoller's name after the Debtor had executed the document.  Mr. Ellison also testified that

---

[9] The motion was subsequently withdrawn on May 14, 2013, and another motion to sell the Valley Mart Exxon leasehold free and clear of liens was filed in Ms. Miller's case on May 30, 2013.  After notice and hearing, an Order was entered on June 17, 2013, granting the motion with the proceeds to be paid to Tennessee State Bank on its mortgage obligation and any net proceeds to be held by Ms. Mostoller pending determination of ownership and distribution.

he personally typed in the stipulations that the Sale Agreement was subject to third party and bankruptcy court approval.

Additionally, Mr. Ellison testified with respect to the 3174 Wears Valley Road Property which is currently listed for sale in MLS and for which there is a "For Sale" sign in front of the property. TRIAL EX. 56; COLL. TRIAL EX. 57.  Mr. Ellison stated that he first listed the 3174 Wears Valley Road Property in MLS in 2009, that it was off the market for a while, then re-listed in February 2011.  With respect to the current listing, Mr. Ellison testified that he automatically extended it without conferring with the Debtor, and that the auto-extension was done based upon their previous relationship.  He also testified that the sign located on the property was installed in 2011, has been there continuously since that date, and that anyone driving by the 3174 Wears Valley Road Property could see it.  Additionally, Mr. Ellison also acknowledged that he routinely checks with trustees in bankruptcy cases; however, he did not in this case based upon his previous relationship with the Debtor.  Mr. Ellison's testimony was echoed by that of the Debtor, who testified that he did not sign a current MLS listing for the 3174 Wears Valley Road Property nor did he know that the property was listed in MLS.  With respect to the "For Sale" sign, the Debtor testified that although the property is next door to his office at Cove Mountain Realty, Inc., he has advised Mr. Ellison that the property can still be sold but it cannot be sold through him, that it can only be sold through the bankruptcy trustee.

Per her testimony, Ms. Mostoller believes that she has now received all documents and information that has been requested from the Debtor that are available.  Additionally, the court did not find, from her testimony, that Ms. Mostoller believed that the Debtor had not been forthcoming

with information and/or documentation or that she did not accept the explanation provided by the Millers concerning the Valley Mart Exxon Sale Agreement and/or the 3174 Wears Valley Road Property.  In fact, she testified that Karen Miller had provided her with the initial documentation she requested in a very timely manner and that Mrs. Miller has been quite helpful in providing her with the requested documentation.  Ms. Mostoller also testified that she has received sufficient explanations concerning documents that were requested but unavailable or lost and that she recalled having been advised about the execution of the Sale Agreement by Mrs. Miller's attorney.  The mere fact that the Chapter 7 Trustee filed a motion for turnover to protect assets that could have easily been used and/or sold does not rise to any level of bad faith, particularly considering the parties came to an agreement, the Trustee withdrew her motion, and the Debtor has done what he agreed to do and turned over the agreed upon assets.  Furthermore, nothing within Ms. Mostoller's testimony led the court to believe that she considered any of her dealings with the Debtor to be in any way indicative of bad faith.[10]

Similarly, Tennessee State Bank cites the Debtor's unauthorized post-petition payments for property taxes to Sevier County and for the Illinois Residence as evidence of his bad faith.  As reflected in the listing of delinquent property taxes owed to Sevier County, Tennessee, the Millers

---

[10] Tennessee State Bank also included within its Statement of Cause Factors and Bad Faith Acts the fact that the Millers have allowed Cove Mountain Realty, Inc. and Movieland Games to occupy properties in which the Millers hold a joint ownership interest without receiving any value or rental income from either company.  At trial, the Debtor testified that he would move his office at Cove Mountain Realty, Inc. in the event a paying tenant sought to rent the space.  He also acknowledged that while Cove Mountain Realty, Inc. does not currently pay rent, in the event the case is converted, if the property is not rented or sold, he intends to collect rent from Cove Mountain Realty, Inc.  With respect to Movieland Games, the Debtor testified that the business is failing and it needs to be closed.  He further stated that he will seek a paying tenant for that property as well.  Although the court agrees that the estate has not benefitted from the failure of the Debtor to collect rents from these closely held businesses, the court does not agree that this failure meets the standards for bad faith required under *Marrama*.

made the following payments totaling $15,167.12 which were applied to property taxes incurred in

2010 and 2011, after the Involuntary Petition was filed on September 28, 2012: (1) on November 27,

2012, in the amount of $52.00; (2) on March 4, 2013, in the amount of $2,395.00; (3) on March 28,

2013, in the amounts of $314.00, $749.00, and $4,404.00; and (4) on June 14, 2013, in the amounts

of $1,185.84 and $6,067.28. TRIAL EX. 37.  Additionally, the Debtor recently paid approximately

$8,000.00 to avoid a tax sale of the Illinois Residence.

When questioned about payment of the various taxes, the Debtor testified that he had not

known that he was not supposed to pay the taxes he paid to Sevier County but that any payments

made to Sevier County would have been made by Mrs. Miller towards back taxes owed on Cove

Mountain Realty, Inc. properties and would have been paid from Cove Mountain Realty, Inc. funds.

There was no evidence to the contrary.  With respect to the Illinois Residence, the Debtor testified

that his daughter, grandson, and former spouse have lived in the house for nine or ten years, and his

daughter is supposed to pay the taxes, but not only did she not pay them in 2012, she did not advise

the Debtor that they were unpaid until the last minute, forcing him to pay them to avoid a tax sale.

The Debtor acknowledged that he originally paid the taxes with estate funds but was advised by the

attorney for the United States Trustee that he had to repay those funds, which he did the following

day using his exempt social security monies.  He also testified that his daughter has multiple

sclerosis and his ex-wife has cancer, and although they earn money through dog grooming and

medical record transcription, respectively, they have good days and bad days and their conditions

make it difficult for either to be employed full-time.  It is not indicative of bad faith that the Debtor

wanted to protect the home in which members of his family reside and although he used estate funds without authorization, he reimbursed the full amount immediately with his social security payments.

The court also does not believe that the Debtor intentionally left out any creditors or that the failure to initially list all creditors constitutes bad faith. With respect to the identification of creditors in association with the Involuntary Petition, there is no dispute that the Debtor filed his initial List of Creditors, listing seventeen creditors, as an attachment to the Debtor's Amended Answer to Involuntary Petition Filed by Tennessee State Bank on October 24, 2012, which he then amended later that same date to include two additional creditors, or that he then filed an Amended List of Creditors, evidencing twenty-five creditors, on December 7, 2012. COLL. TRIAL EX. 29; TRIAL EX. 31. Likewise, there is no dispute that the Debtor included only eleven creditors in the Verification of Creditor Matrix filed with his Voluntary Petition in the Middle District of Florida on September 19, 2012. COLL. TRIAL EX. 32. When questioned about these inconsistences at trial, the Debtor testified that he did not review the Verification of Creditor Matrix filed in his Florida case before it was filed and that only five of the eleven listed on Collective Trial Exhibit 32 were actually creditors. Additionally, with respect to his involuntary case, the Debtor testified that he was asked in a deposition whether all of his creditors were listed and it occurred to him that there were others but that he was the one to disclose that creditors were not listed. He also testified that he never intentionally failed to include all of his creditors, that he had worked with his former attorney's staff to complete his statements and schedules, and when it was discovered that creditors had not been included, amendments were filed to add them. Finally, the Debtor stated that as far as he is aware, all of his creditors have been disclosed in his bankruptcy case.

29

As stated, there is no dispute that the Debtor filed an initial list of creditors with his amended answer on October 24, 2012, or that he amended the list of creditors on that same date to add Sevier County Bank and Tennessee State Bank.  The Debtor's list of creditors was then amended once more on December 7, 2012, to include six additional creditors, and it has not been amended again since that date.  The Debtor testified that he thought of the additional creditors when questioned during a deposition and steps were then taken to amend the list of creditors to include those previously omitted.  It is significant that the Debtor was the party to identify the omitted creditors, that he quickly took steps to amend the list to add them, and that no other creditors have since been required to be added.  It is also significant to note that the Debtor was represented by two different attorneys between the initial filing date and December 7, 2012, the date that the final amendment to the list of creditors was filed.  Based upon the record as well as his testimony, the court does not find that the inconsistencies with respect to the lists of creditors evidences any bad faith by the Debtor to justify denying the Motion to Convert.

Similarly, the inconsistences raised by Tennessee State Bank with respect to the Debtor's statements and schedules does not rise to the level of bad faith necessary to deny conversion under *Marrama*.  At trial, the Debtor testified that he went over his statements and schedules with someone in Mr. Ray's office before they were filed on January 23, 2013, and amended on March 20, 2013, and that he believes that the assets listed were those he owned as of September 28, 2012 and as of January 9, 2013.  *See* COLL. TRIAL EX. 16.  He acknowledged that it appeared that his Schedule B appeared to reflect that the "–" in the "Husband, Wife, Joint, or Community" column was intended to be a continuation of jointly owned property, although making that presumption, the schedule

30

incorrectly states that his clothing is jointly owned when Mrs. Miller clearly does not own it. COLL.
TRIAL EX. 16. Schedule B also reflects that the Millers jointly owned Cove Mountain Realty, Inc.
and Valley Mart Exxon but the values were listed as "unknown." COLL. TRIAL EX. 16. The Debtor
also testified that he and Mrs. Miller both owned the Cloud 9 cabin, but he was unsure whether there
were, as of September 28, 2012 or January 9, 2013, any uncashed checks from rents.[11] With respect
to the expectancy interests in rent proceeds, the Debtor testified that figure was most likely January
2013, although he did not believe that there would have been a higher expectancy interest as of
September 28, 2012.

With respect to his Statement of Financial Affairs, the Debtor testified that he did list his
income from Cove Mountain Realty, Inc. as "Income from employment or operation of business"
in response to question one and his social security as "Income other than from employment or
operation of business" in response to question two, but he did not list in response to either question
income derived from the sale of any real property between 2010 and 2012. TRIAL EX. 17. However,
the Debtor testified the Millers sold the Whetstone property in 2010 to Russell and Melanie Weaver
(Weavers), *see* TRIAL EX. 25, which was not listed in his Statement of Financial Affairs, and that
they sold real property to the Headricks in January 2011, *see* TRIAL EX. 33, and one lot in the
Thunder Mountain project, both of which were listed in response to question ten "Other transfers,"
stating that he was unsure why these transfers were not included as income.[12] TRIAL EX. 17. As for

---

[11] The Debtor did clarify that after the Order for Relief was entered against Mrs. Miller, she had one or two
checks from their businesses in her possession and was instructed by the United States Trustee's office to deposit those
funds into her debtor-in-possession account.

[12] In response to question ten "Other transfers," a transfer to James Headrick in 2011 for "Real Estate – Hickory
Hollow" is listed, TRIAL EX. 17; however, the General Warranty Deed from the Millers transfers the property to James

(continued...)

question three, "Payments to creditors," which discloses that the Debtor had "various" payments on "various" dates with "$0.00" paid and "$0.00" still owing. TRIAL EX. 17. At trial, the Debtor testified that there were payments made to Hackney within the ninety days preceding the filing, but he could not answer whether there were any others. Additionally, in response to question nine "Payments related to debt counseling or bankruptcy," the Debtor acknowledged that Mr. Tranum, who represented both the Debtor and Mrs. Miller, was not listed, and he could not state how much the Millers paid to him, stating that Mrs. Miller would have been the one to make the payment. TRIAL EX. 17. Finally, with respect to question eleven "Closed financial accounts," the Debtor testified that he does not remember the amount in the SunTrust checking account when it was closed. He also testified that there were other accounts with SunTrust that were closed in the year preceding the bankruptcy filing, but all were with SunTrust, and he does not know why the information for the account numbers and amounts was not listed. TRIAL EX. 17. Additionally, the Debtor's Statement of Intention, entered into evidence as Trial Exhibit 52, reflects that the Debtor intends to surrender a number of properties that, at trial, he testified that he intends to retain. *See supra* n.6.

More specifically with respect to the Debtor's income, Tennessee State Bank questioned the Debtor about the disposition of proceeds of approximately $314,000.00 from the sale of the Whetstone property, *see* TRIAL EX. 55, and approximately $400,000.00 paid by the Weavers on a Purchase Money Note in connection with the sale, *see* TRIAL EX. 27, to which he testified that the funds were used to pay off a tax lien to the Internal Revenue Service of between $100,000.00 and

---

[12](...continued)
Headrick and his wife, Glenda Gail Headrick. TRIAL EX. 33. The Debtor testified that he does not recall any other transfers of real property to Mr. Headrick and the one listed in his Statement of Financial Affairs would be the same transfer reflected in Trial Exhibit 33.

$200,000.00, to pay off the settlement of a lawsuit with Century 21 of roughly $190,000.00, and

other business-related bills.  He also testified that, to the best of his knowledge, Mrs. Miller did not

receive any of the funds just for herself.  With respect to the Millers' 2009 and 2010 tax returns and

the large disparity in income and wages reflected therein:  total income of $213,437.00 in 2009 and

-$54,970.00 and wages of $79,000.00 in 2009 and $8,000.00 in 2010, COLL. TRIAL EX. 28, the

Debtor testified that he had stopped paying himself as business decreased and the economy

worsened.  Comparing then his income as reflected in Schedule I , which consists of $4,472.60 for

"Income from real property" and $1,575.00 from social security for a total for the Debtor only of

$6,047.60, in response to the inquiry where the income from real property was derived, the Debtor

testified that he believes it reflects half of the income from the shopping center, Subway, the cabin,

and the campground lots, with the other half attributed to Mrs. Miller.[13]  Additionally, as previously

discussed, all monies that are reflected as income from real property in his Schedule I have been paid

into Mrs. Miller's debtor-in-possession account, the Valley Mart Exxon account, or the Cove

Mountain Realty, Inc. account and none of that income is being paid to the Debtor directly.  The

Debtor testified that, as of the date of trial, the only income that he directly receives is $1,000.00 per

week from Cove Mountain Realty, Inc. and $1,604.00 per month in social security.

Under the *Marrama* standard, in order to find bad faith sufficient to deny conversion, the

court must find that the Debtor's conduct was intentional and egregious, such as transferring or

concealing property without consideration with the intent to hinder creditors, fraud, or an abuse of

---

[13] Schedule I also reflects monthly income for Mrs. Miller in the amount of $8,937.02, consisting of $6,500.00 in wages, less $2,035.58 in taxes, plus $4,472.60 for income from real property, resulting in the Millers reflecting a combined average monthly income of $14,984.62.  COLL. TRIAL EX. 16.

the bankruptcy process.  The court does not find such egregious behavior present in this case.

Clearly, the Debtor's statements and schedules contain omissions and inconsistencies; however, the

court does not find any intent on behalf of the Debtor to file fraudulent or misleading statements.

Furthermore, while it does not make them excusable, the fact that this was an involuntary case filed

against the Debtor is relevant.  The Debtor prepared and filed the statements and schedules in

January 2013, to reflect his information as it would have existed in September 2012, and, as

previously discussed, the Debtor himself knew very little about his personal and business finances,

having relied almost entirely upon Mrs. Miller or, in the case of the Millers' taxes, his accountant,

while he conducted operations of the businesses.  Additionally, having had the opportunity to review

these statements and schedules more closely in connection with this litigation, there is nothing to

prevent the Debtor from amending these documents to better reflect the information that he has now

testified to in addition to providing further disclosures in a plan of reorganization.

The Debtor testified that he intends to reorganize under Chapter 11 through the liquidation

of certain properties and the retention of lucrative businesses and properties, many of which are

jointly owned with Mrs. Miller.  He also testified that he and Mrs. Miller intend to work together in

their respective Chapter 11 cases to pay off their joint liabilities.  At trial, the Debtor testified that

his estate is not currently receiving any of the income received from operation of their jointly held

properties and/or businesses, that other than the Subway monies, which are deposited into a Valley

Mart Exxon account, all income received from the shopping center has been paid into Mrs. Miller's

debtor-in-possession account, and none of the income from the campground has been paid into the

Debtor's estate, although he is unsure whether Mrs. Miller has deposited those funds into her debtor-

34

in-possession account or into the Cove Mountain Realty, Inc. account.  Additionally, Ms. Spurgeon

testified that Tennessee State Bank does not believe that the Chapter 7 Trustee can get a higher value

for the properties to be sold than the Debtor can realize.  The court believes that this case should be

in a Chapter 11 to do justice to all creditors, including Tennessee State Bank, and to allow the Debtor

and Mrs. Miller to more easily administer their joint assets.  Accordingly, the Motion to Convert

shall be granted, and the Debtor's case shall be converted from Chapter 7 to Chapter 11.

An Order consistent with this Memorandum will be entered.

FILED:  July 24, 2013

BY THE COURT

*/s/  RICHARD STAIR, JR.*

RICHARD STAIR, JR.
UNITED STATES BANKRUPTCY JUDGE

35